Phyllis M. Jones, United States Bankruptcy Judge
Before the Court are the Motion for Summary Judgment (the "Motion ") (Doc. # 42), Brief in Support of Motion for Summary Judgment (hereinafter "Motion Brief ") (Doc. # 43), and Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Statement of Undisputed Facts " or "SUF " when citing) (Doc. # 44) filed by Hill & Hill Farms Partnership ("Hill & Hill "), Billy Hill, Jeff Hill, and Tanya Hill (the four collectively the "Partnership "). Also before the Court are the Response to Motion for Summary Judgment (the "Response ") (Doc. # 59), Amended Brief in Support of Response to Motion for Summary Judgement ("Response Brief ") (Doc. # 64), and Amended Response to Statement of Undisputed Material Facts (SUMF) in Support of Motion for Summary Judgment ("Response to Statement of Undisputed Facts " or "Resp. SUF " when citing) (Doc. # 63) filed by M. Randy Rice, Trustee (the "Trustee "). In addition, before the Court are the Reply to Trustee's Response to Defendants' Motion for Summary Judgment ("Reply Brief ") (Doc. # 65) filed by the Partnership, the Sur-Reply in Support of Response to Motion for Summary Judgment ("Sur-Reply Brief ") (Doc. # 73) filed by the Trustee, and the Sur-Sur Reply to Trustee's Sur-Reply in Support of Response to Motion for Summary Judgment ("Sur-Sur Reply ") (Doc. # 75) filed by the Partnership. All the above documents and their exhibits will be referred to below as the "Summary Judgment Documents ."
In his complaint, the Trustee seeks to avoid a $405,274.68 transfer as a preferential transfer against the Partnership and Farmers and Merchants Bank (the "Bank "). The Partnership, for purposes of its Motion, does not "contest that the Trustee has established a prima facie case" pursuant to Section 547(b), but asserts that even if the Transfer were avoidable under Section 547(b), the transfer is protected from avoidance under Sections 547(c)(1), 547(c)(2)(A) and (B), and 547(c)(4). (Mot. ¶ 1).
*54 I. JURISDICTION
The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.
II. FACTS AND PROCEDURAL BACKGROUND
On October 23, 2014, Turner Grain Merchandising, Inc. ("Turner Grain " or the "Debtor ") filed a case under Chapter 11 of the United States Bankruptcy Code. (SUF ¶ 2). The case was converted to a case under Chapter 7 on May 15, 2015. (SUF ¶ 2). Richard L. Cox was initially appointed as the trustee and served in that capacity until M. Randy Rice was appointed the successor trustee. (SUF ¶ 1).
On October 7, 2016, the Trustee filed this adversary proceeding alleging that a payment by check dated July 31, 2014, in the amount of $405,274.68 (the "Transfer ") was a preferential transfer. (SUF ¶ 3).
Prior to approximately mid-August of 2014, Turner Grain was in the business of purchasing grain, including wheat, from farmers in eastern Arkansas and surrounding areas. (SUF ¶ 4).
Hill & Hill is a farming partnership engaged in growing grain in and around Lee County, Arkansas, and is owned by Billy Hill, Jeff Hill and Tanya Hill. (SUF ¶ 5).[1] Hill & Hill, in the ordinary course of its business, sold rice, soybeans, corn, and wheat to Turner Grain as well as to other grain buyers. (SUF ¶ 6).
In the ordinary course of the Partnership's business, Jeff Hill would contact Turner Grain and inquire about pricing options and then enter a booking agreement with Turner Grain for a specific amount of grain for future delivery at a set price. (SUF ¶ 7). Although booking agreements may have been made in Jeff Hill's name, it was understood by all parties that the booking agreements were for Hill & Hill's crops. (SUF ¶ 9).
When the time period for delivery under a specific booking agreement arrived, Jeff Hill would communicate with Turner Grain to notify it as to when the delivery would begin and how many truckloads of grain were anticipated. (SUF ¶ 11). Deliveries under the booking agreements typically spanned a number of weeks until the contract was complete depending on the number of bushels involved, the weather, and other factors over which neither party had control. (SUF ¶ 11).
The checks issued by Turner Grain in payment for grain delivered under the booking agreements with Hill & Hill were usually made payable to Hill & Hill and the Bank, its lender. (SUF ¶ 10).
Both parties have presented timelines for the Court to consider in analyzing Hill & Hill's ordinary course of business defense. The parties dispute the actual number of transactions between Hill & Hill and Turner Grain. Each have fifteen "transactions" in their original timelines although the transactions are not the same. The information presented by the parties in their respective timelines is reflected in detail in the ordinary course of business discussion below.
On or about December 20, 2013, the Bank made a loan to Hill & Hill for the sum of $1,098,535.00 as evidenced by a promissory note (the "Agricultural Loan "). (SUF ¶ 27; Mot. Ex. 3, at Ex. A). On or about December 20, 2013, Hill & Hill granted the Bank a security interest *55 to secure the repayment of the Agricultural Loan and all other indebtedness owed to the Bank by Hill & Hill. (SUF ¶ 27; Mot. Ex. 3, at Ex. B).
The security agreement granted the Bank a security interest in all Hill & Hill's assets, including "any and all crops now growing or to be grown in the year 2014 wherever located including all now owned or hereafter acquired inventory and commingled goods wherever located and all products and proceeds thereof." (SUF ¶ 27; Mot. Ex. 3, at Ex. B).
A UCC financing statement was filed in the office of the Arkansas Secretary of State on December 27, 2013, reflecting Hill & Hill as the "debtor" and the Bank as the "secured party" (the "UCC-1 "). (Mot. Ex. 3, at Ex. C). The collateral listed on the UCC-1 was:
All present and future right, title and interest in and to any and all personal property of [Hill & Hill], whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation the following categories of property as defined in the Revised Article 9 of the Uniform Commercial Code (the "UCC"): goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter-of-credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), all supporting obligations and all proceeds, products, additions, accessions, substitutions and replacements of the foregoing property.
Any term used herein which is defined in the UCC shall have the meaning set forth in the UCC, and if the meaning is modified by an amendment, modification or revision to the UCC, such modified definition will apply automatically as of the date of such amendment, modification or revision to the UCC.
This financing statement covers, and is intended to cover, all personal property of [Hill & Hill].
All of the following which [Hill & Hill] owns now or in the future, together with all parts, accessories, repairs, replacements, improvements, and accessions, and wherever located: Government payments and programs: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, direct payments and counter-cyclical payments, and conservation reserve payments under any preexisting, current, or future federal or state government program. Any and all crops now growing or to be grown in the year 2014 wherever located including all now owned or hereafter acquired inventory and commingled goods wherever located and all products and proceeds thereof.
(Mot. Ex. 3, at Ex. C) (emphasis added).
In his affidavit, Bradley A. Chambless, the chief lending officer of the Bank, stated that "in accordance with the Food Security Act, the Bank gave direct notice to Turner Grain of its security interest in the crops." (Mot. Ex. 3 ¶ 6). Two notices were attached to Mr. Chambless's affidavit. (Mot. Ex. 3, at Ex. D). The first notice is titled, "Farmers that have pledged crops for 2013 to the Farmers and Merchants *56 Bank, Stuttgart, Arkansas."[2] (Mot. Ex. 3, at Ex. D). The notice includes the name of the entity farming, an address, and an ID number. (Mot. Ex. 3, at Ex D). Included in the notice was "Hill & Hill Partnership, 3396 Hwy 238, Moro, AR 72368, ID # XXXX5172." (Mot. Ex. 3, at Ex. D). The second notice is titled, "Farmers that have pledged crops for 2014 to the Farmers and Merchants Bank, Stuttgart, Arkansas." (Mot. Ex. 3, at Ex. D). The second notice also included "Hill & Hill Partnership, 3396 Hwy 238, Moro, AR 72368, ID # XXXX5172." (Mot. Ex. 3, at Ex. D). The address for Hill & Hill in the notices is the same address listed on the promissory note, security agreement, and UCC-1 for Hill & Hill. The notices do not include the address of the Bank, a description of the farm products subject to the Bank's security interest, the amount of such products, nor the name of the county or counties in which the farm products are produced or located. No additional notices appear in the Court's record.
The Debtor acknowledged receiving a copy of the 2014 list of farmers that had pledged crops to the Bank by acknowledgements dated April 16, 2014, and July 24, 2014. (Mot. Ex. 3, at Ex. D).
On or about March 31, 2014, Turner Grain and Hill & Hill entered into a booking agreement for Turner Grain to purchase 55,000 bushels of wheat grown by Hill & Hill for June-July 2014 delivery. (Mot. Ex. 2 ¶ 8). The wheat was delivered, and Turner Grain paid Hill & Hill for the wheat by issuing a check dated July 31, 2014. The check was made payable jointly to Hill & Hill and the Bank in the amount of $405,274.68, and is the Transfer at issue in this proceeding. (Mot. Ex. 2 ¶ 9). The check was deposited into Hill & Hill's bank account on August 4, 2014. (Mot. Ex. 3, at Ex. E).
Tanya Hill stated in her affidavit that the Transfer was intended by the Debtor and the Partnership to be a contemporaneous exchange for new value given to the Debtor.[3] (Mot. Ex. 1 ¶ 12).
Tanya Hill also stated in her affidavit that after the Transfer, Hill & Hill "delivered 800.71 bushels of corn with a value of $4,099.64 and 352 bushels of wheat with a value of $2,471.04 for which [Hill & Hill] never received payment." (Mot. Ex. 1 ¶ 14). In addition, she stated in her affidavit that the Debtor's "unilateral cancellation of outstanding contracts at the time it closed relieved Turner Grain of an obligation of at least $300,897.43 at market prices." (Mot. Ex. 1 ¶ 14).
The Court having reviewed the Summary Judgment Documents finds that the Motion should be granted in part and denied in part. As discussed below, the Court denies the Motion as to the affirmative defense of Section 547(c)(1). The Court grants the Motion as to the first element of the affirmative defenses of Section 547(c)(2)(A) and (c)(2)(B), but denies the Motion as to the affirmative defenses of Section 547(c)(2)(A) and (c)(2)(B) overall. The Court grants the Motion as to the affirmative defense of Section 547(c)(4) as it relates to the 800.71 bushels of corn and 352 bushels of wheat, but denies the Motion *57 under 547(c)(4) as it relates to the cancellation of contracts.
III. DISCUSSION
As stated above, the Trustee seeks to avoid the Transfer as a preferential transfer against the Partnership and the Bank. The Partnership asserts that even if the Transfer were avoidable under Section 547(b), the Transfer is protected from avoidance under Sections 547(c)(1), 547(c)(2)(A) and (B), and 547(c)(4). Each of the affirmative defenses will be discussed separately below.
A. Contemporaneous Exchange for New Value - Section 547(c)(1)
The contemporaneous exchange for new value defense provides that the Trustee may not avoid a preferential transfer to the extent that such transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1) (2012).
"The purpose of this exception is to protect transactions that do not result in a diminution of the bankruptcy estate." Velde v. Kirsch, 543 F.3d 469, 472 (8th Cir. 2008) (citing Anderson-Smith & Assocs., Inc. v. Xyplex, Inc. (In re Anderson-Smith & Assocs., Inc.), 188 B.R. 679, 688 (Bankr. N.D. Ala. 1995) ). To prevail on the contemporaneous exchange for new value exception, the Partnership has the burden of proving that both the Debtor and the Partnership intended the exchange to be contemporaneous; that the exchange was, in fact, contemporaneous; and that the exchange was for new value. Harrah's Tunica Corp. v. Meeks (In re Armstrong), 291 F.3d 517, 525 (8th Cir. 2002) (citing Official Plan Comm. v. Expeditors Int'l of Wash., Inc. (In re Gateway Pac. Corp.) , 153 F.3d 915, 918 (8th Cir. 1998) ).
The Partnership initially argues that the Bank held a perfected security interest in the Partnership's crops and the release of the security interest in the wheat was the contemporaneous exchange for new value. (Mot. Br. at 8-12). Consistent with that argument, Mr. Chambless states in his affidavit, "[t]he Bank's security interest in the wheat sold to Turner Grain was not released until the Bank's receipt of the payment on August 4, 2014." (Mot. Ex. 3 ¶ 8).
The Trustee responded, arguing that noncompliance with the requirements of the Food Security Act of 1985 (the "Food Security Act ")[4] resulted in the wheat being purchased by Turner Grain free and clear of the Bank's security interest so any act by the Bank to "release" its security interest in the wheat was of no new value to Turner Grain. (Resp. Br. at 9-16).
The Partnership then raised a second theory in its Reply Brief. There, the Partnership argued that even if the Food Security Act requirements were not met, "the Bank nonetheless retained an enforceable security interest in the proceeds " of the crop and "[w]hen [the Bank] received the check, the Bank released its security interest in the crop proceeds ." (Reply Br. at 18, 20) (emphasis added).
For the reasons stated below, summary judgment as to both theories is denied but for different reasons. The Court will discuss the Partnership's two theories separately below.
(1) Security Interest in Crops / Wheat
The three elements of the contemporaneous exchange for new value defense are intricately related. While parties may *58 intend a contemporaneous exchange for new value, there must still, in fact, be a contemporaneous exchange where new value is given.
As to the first element, the intention of the parties, the Partnership asserted as a statement of undisputed fact that "[t]he Transfer described in the Complaint was intended by Turner Grain and the [Partnership] to be a contemporaneous exchange for new value given to Turner Grain, specifically, the release of [the] Bank's security interest in the wheat and the exchange was, in fact, substantially contemporaneous." (SUF ¶ 32). In support of this statement the Partnership relies on both the affidavit of Tanya Hill, in which she makes the same statement, and Exhibit C to her affidavit, which are copies of the check stub for the Transfer and the related settlement sheets. (Mot. Ex. 1 ¶ 12; Mot. Ex. 1, at Ex. C).
The Trustee disputes the Partnership's statement on the basis that it is a legal conclusion inappropriate for inclusion as an undisputed fact. (Resp. SUF ¶ 32). Other than a denial of the statement, the Trustee's Response and Sur-Reply do not further address this first element.
As to the second element, that the exchange was, in fact, contemporaneous, the Partnership relies on Mr. Chambless's affidavit in which he stated that "[t]he Bank's security interest in the wheat sold to Turner Grain was not released until the Bank's receipt of the payment on August 4, 2014." (Mot. Ex. 3 ¶ 8).
In his Response Brief the Trustee stated that he "does not dispute that the Transfer was jointly payable to the Partnership and the Bank. Nor ... that the Bank would have released its lien contemporaneously with receiving and endorsing the check for deposit." (Resp. Br. at 10) (emphasis added).[5]
In the discussion that follows on the third element, the Court determines that Turner Grain received the wheat free and clear of the Bank's security interest pursuant to the Food Security Act resulting in no new value being given in the exchange. Therefore, regardless of the Partnership's asserted intention and the parties' agreement that the Bank "would have" released the security interest in the wheat upon receipt of the Transfer, the absence of new value in the exchange is fatal to the Partnership's defense.
Indeed, the third element requires that the exchange was for new value . New value is defined by statute to mean "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include any obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2) (2012). When new value is given in a contemporaneous exchange "other creditors are not adversely affected" by the transfer. Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 326 (8th Cir. 1997) (citing Pine Top Ins. Co. v. Bank of Amer. Nat'l Trust & Sav. Ass'n , 969 F.2d 321, 324 (7th Cir. 1992) ).
The Partnership's argument in support of this element is based on what the parties have referred to as the "Velde Defense."[6] Basically, the Partnership argues *59 that the Bank held a perfected security interest in Hill & Hill's crops; gave Turner Grain direct notice of its security interest, which the Debtor acknowledged receiving and acknowledged by making checks jointly payable to Hill & Hill and the Bank; and the Bank's extinguishment of its security interest in the wheat at the time of payment was a contemporaneous exchange for new value.
The Trustee argues that because Hill & Hill did not comply with the requirements of the Food Security Act, Turner Grain purchased the wheat related to the Transfer free and clear of the Bank's lien under the Food Security Act in the first instance and the Bank's release of its security interest did not give the Debtor anything that it did not already have; i.e., no new value was given. The Court has termed the Trustee's argument the "Tin Man Defense."[7]
To determine the issues raised by the parties the Court must analyze the relationship between Arkansas law[8] and the Food Security Act.
Arkansas law, as it pertains to farm products, crops, and crop proceeds, provides that a security interest is enforceable against the debtor with respect to the collateral only if value has been given, the debtor has rights in the collateral, and the debtor has authenticated a security agreement that provides a description of the collateral. ARK. CODE ANN. § 4-9-203 (Supp. 2017). To perfect the security interest, a financing statement must be filed with office of the Secretary of State. ARK. CODE ANN. § 4-9-501 (Supp. 2017). The financing statement must meet certain requirements and is "sufficient only if it: (1) provides the name of the debtor; (2) provides the name of the secured party or a representative of the secured party; and (3) indicates the collateral covered by the financing statement." ARK. CODE ANN. § 4-9-502(a) (Supp. 2017).
Arkansas law also provides that "a buyer in ordinary course of business, other than a person buying farm products from a person engaged in farming operations , takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." ARK. CODE ANN. § 4-9-320(a) (2001) (emphasis added). This provision is commonly found in the Uniform Commercial Code statutes of other states, permitting a secured lender of farm products to enforce its liens against purchasers of farm products in some instances.[9]
Congress found that "these laws subject the purchaser of farm products to double payment for the products, once at the time of purchase, and again when the seller fails to repay the lender." 7 U.S.C. § 1631(a)(2) (2012). Congress made further findings that "the exposure of purchasers of farm products to double payment inhibits free competition in the market for farm products" and "constitutes a burden on ...
*60 interstate commerce in farm products." 7 U.S.C. § 1631(a)(3)-(4) (2012). These findings by Congress led to the passage of the Food Security Act.
The Food Security Act provides in relevant part:
Except as provided in subsection (e) and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.
7 U.S.C. § 1631(d) (2012). It then explains when the buyer of farm products will take subject to a security interest created by the seller, providing:
A buyer of farm products takes subject to a security interest created by the seller if
-
(1)(A) within 1 year before the sale of the farm products, the buyer has received from the secured party or the seller written notice of the security interest organized according to farm products that -
(i) is an original or reproduced copy thereof;
(ii) contains,
(I) the name and address of the secured party;
(II) the name and address of the person indebted to the secured party;
(III) the social security number, or other approved unique identifier, of the debtor or, in the case of a debtor doing business other than as an individual, the Internal Revenue Service taxpayer identification number, or other approved unique identifier, of such debtor; and
(IV) a description of the farm products subject to the security interest created by the debtor, including the amount of such products where applicable, crop year, and the name of each county or parish in which the farm products are produced or located.
(iii) must be amended in writing, within 3 months, similarly signed, authorized, or other authenticated and transmitted, to reflect material changes;
(iv) will lapse on either the expiration period of the statement or the transmission of a notice signed, authorized, or otherwise authenticated by the secured party that the statement has lapsed, whichever occurs first; and
(v) contains any payment obligations imposed on the buyer by the secured party as conditions for waiver or release of the security interest; and
(B) the buyer has failed to perform the payment obligations; or
(2) in the case of a farm product produced in a State that has established a central filing system -
(A) the buyer has failed to register with the Secretary of State of such State prior to the purchase of farm products; and
(B) the secured party has filed an effective financing statement or notice that covers the farm products being sold; or
(3) in the case of a farm product produced in a State that has established a central filing system, the buyer -
(A) receives from the Secretary of State of such State written notice as provided in subsection (c)(2)(E) or *61 (c)(2)(F) that specifies both the seller and the farm product being sold by such seller as being subject to an effective financing statement or notice; and
(B) does not secure a waiver or release of the security interest specified in such effective financing statement or notice from the secured party by performing any payment obligation or otherwise.
7 U.S.C. § 1631(e) (2012).
The term "central filing system" is defined by the Food Security Act to mean "a system for filing effective financing statements or notice of such financing statements on a statewide basis and which has been certified by the Secretary of the United States Department of Agriculture." 7 U.S.C. § 1631(c)(2) (2012).
In a state with a central filing system, the Food Security Act defines "effective financing statement" as one that, among other things, "substantially complies" with the requirements of Section 1631(c)(4). 7 U.S.C. § 1631(c)(4)(H) (2012). In states where there is not a central filing system, the buyer of farm products will take subject to a security interest created by the seller only if the requirements of Section 1631(e)(1)(A) are met. 7 U.S.C. § 1631(e) (2012).
Arkansas does not have a central filing system.[10] Where there is not a central filing system, the primary hurdle is the notice requirement. Unlike the "substantial compliance" allowed for an effective financing statement to be filed in the central filing system, Section 1631(e)(1)(A) requires strict compliance. See Farm Credit Midsouth, PCA v. Farm Fresh Catfish Co., 371 F.3d 450, 453 (8th Cir. 2004) ("By including substantial compliance language in defining an effective financing statement for the central filing exception and excluding such language from the direct notice exception, Congress presumptively and logically intended that a secured creditor must strictly comply with the direct notice exception." (citing Lutheran Soc. Serv. of Minn. v. United States, 758 F.2d 1283, 1289 (8th Cir. 1985) ) ).
In applying the facts of this case to the law discussed above, the Court first notes that the undisputed facts support the Partnership's argument that the Bank held a properly perfected security interest in Hill & Hill's wheat crop under Arkansas law. From the record it is undisputed that the Bank gave value to Hill & Hill in the form of the Agricultural Loan; Hill & Hill had rights in the collateral, the wheat grown by the Partnership; and Hill & Hill authenticated a security agreement granting the Bank a security interest in the collateral, i.e. , "[a]ny and all crops now growing or to be grown in the year 2014 wherever located." (Mot. Ex. 3, at Ex. B). The Bank then filed a financing statement with the Arkansas Secretary of State's Office with the name and address of both Hill & Hill and the Bank, along with a description of its collateral. (Mot. Ex. 3, at Ex. C).
There is no dispute that Turner Grain was a buyer in the ordinary course of business buying farm products from Hill & Hill, an entity engaged in farming operations. Therefore, applying Arkansas law, Turner Grain bought the wheat related to the Transfer from Hill & Hill subject to the Bank's security interest. ARK. CODE ANN. § 4-9-320 (2001). The analysis, however, does not end here. The Court must now consider the relationship of Arkansas law to the Food Security Act.
*62 Under the Food Security Act, notwithstanding the provisions of Arkansas law, Turner Grain, as a buyer in the ordinary course of business buying farm products from Hill & Hill, a seller engaged in farming operations, would take free of the security interest created by Hill & Hill in favor of the Bank even though the Bank's security interest in crops was properly perfected under Arkansas law, unless exceptions contained in Section 1631(e) of the Food Security Act allow a different result. 7 U.S.C. § 1631(d) (2012).
As discussed above, Arkansas does not have a central filing system; consequently, Turner Grain would take subject to the Bank's security interest only if the requirements of Section 1631(e)(1)(A) are met. Accordingly, the Court must determine if the Bank's notices strictly comply with the requirements of Section 1631(e)(1)(A).
It is not disputed that the Bank sent Turner Grain the two notices and that Turner Grain acknowledged receipt of the notices. For the reasons that follow, however, the Court finds that as a matter of law, the undisputed facts prove that the notices do not strictly comply with the requirements of Section 1631(e)(1)(A).
The first notice is titled, "Farmers that have pledged crops for 2013 to the Farmers and Merchants Bank, Stuttgart, Arkansas." (Mot. Ex. 3, at Ex. D). The notice includes "Hill & Hill Partnership, 3396 Hwy 238, Moro, AR 72368, ID # XXXX5172." (Mot. Ex. 3, at Ex. D). The second notice is substantially the same with the title change indicating that it covers crops for 2014 instead of 2013. (Mot. Ex. 3, at Ex. D). The notices do not contain the address for the Bank (other than Stuttgart, Arkansas), the quantity and description of the farm products subject to the security interest, or the name of each county in which the farm products are produced or located.
Based on the undisputed facts concerning the notices, the Bank's notices do not strictly comply with the Food Security Act's direct notice exception. Therefore, Turner Grain purchased the wheat related to the Transfer free of the Bank's security interest even though Turner Grain knew of the existence of the Bank's security interest and even though the Bank held an otherwise properly perfected security interest under Arkansas law. See 7 U.S.C. § 1631(d) (2012) ; Farm Credit Midsouth, 371 F.3d at 453-54.
This result is consistent with the Velde case relied on by the Partnership. In the Velde case the secured party complied with the Food Security Act by filing an effective financing statement in the central filing system in Minnesota. As stated by the District Court, "the release of the security interest occurred only when the bank received 'payment' for the soybeans, pursuant to the Food Security Act." Velde v. Kirsch, 366 B.R. 902, 905-06 (D. Minn. 2007), aff'd, 543 F.3d 469 (8th Cir. 2008). The District Court citied Section 1631(e)(3)(B) in support of this statement, which applies only in states with a central filing system.
Based on the foregoing discussion, the Partnership has failed to meet its burden of proving the third element as to its theory that the Bank's release of the security interest in the wheat was a contemporaneous exchange for new value for the Transfer.
(2) Security Interest in Crop Proceeds
As noted above, the Partnership raised for the first time in its Reply Brief that even if the notice requirements of the Food Security Act were not met and the Bank's security interest in the crops was not protected, that the Bank "retained an *63 enforceable security interest in the proceeds" of the crops. (Reply Br. at 18).
For this theory the Partnership asserts that Turner Grain sold the wheat at issue to "Farmers Supply" or to "ADM" prior to its purchase of the crops and "[t]hereafter, the Debtor held the proceeds of the wheat which were subject to the Bank's security interest." (Reply Br. at 20) (referencing the deposition testimony of Gale Hamrick). The Partnership further asserts that "Turner Grain paid the crop proceeds by way of a check made jointly payable to the Partnership and the Bank. When it received the check, the Bank released its security interest in the crop proceeds." Id.
The record fails to support the assertion of identifiable proceeds being part of the Transfer. The testimony the Partnership quoted from Ms. Hamrick's deposition in support of its theory is general, vague, and insufficient to support the propositions asserted. In addition, Ms. Hamrick made clear in her deposition that her duties and responsibilities only involved the purchase side of Turner Grain's business operations with the farmer, that she had nothing to do with Turner Grain's sale of farm products to other producers, and she never handled the bank deposits. (Resp. Ex. 4 at 9-12).
Without a record to support the assertions being made under the Partnership's "crop proceeds" theory, no further legal analysis of the crop proceeds theory is necessary at this time.
For the foregoing reasons, the Partnership has failed to meet its burden on the affirmative defense of contemporaneous exchange for new value, and summary judgment on this affirmative defense is denied.
B. Ordinary Course of Business - Section 547(c)(2)(A) and (B)
Section 547(c)(2) provides two separate affirmative defenses. Each defense begins with the requirement that the "transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2) (2012). Once this element is met, if the creditor can also prove that the transfer was either "(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms," the creditor can prevent the trustee from recovering the transfer. 11 U.S.C. § 547(c)(2)(A)-(B) (2012). The creditor has the burden of proving this affirmative defense by a preponderance of the evidence. 11 U.S.C. § 547(g) (2012) ; Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs), 9 F.3d 680, 682 (8th Cir. 1993).
There is no "precise legal test" to apply to any of the three elements. Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.), 859 F.3d 599, 607 (8th Cir. 2017). Courts describe the necessary legal inquiry as one requiring " 'a peculiarly factual analysis.' " Id. (quoting In re Armstrong , 291 F.3d 517, 527 (8th Cir. 2002) ).
The purpose of the ordinary course of business exception is " 'to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " Cent. Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902, 904 (8th Cir. 1998) (quoting S. REP. NO. 95-989, at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874; H.R. REP. NO. 95-595, at 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329).
The Court will begin with an analysis of the initial requirement of whether *64 the transfer at issue was in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Hill & Hill. It is undisputed that Turner Grain was in the business of purchasing grain, including wheat, from farmers in eastern Arkansas and surrounding areas. It is also undisputed that Hill & Hill, in the ordinary course of its business, sold rice, soybeans, corn, and wheat to Turner Grain. Finally, it is undisputed that the Transfer at issue was a transfer from Turner Grain to Hill & Hill and the Bank to pay for wheat Turner Grain purchased from Hill & Hill.
Based on these undisputed facts, the Court finds that the first requirement of the ordinary course of business defense, that the transfer paid a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Hill & Hill, is met. 11 U.S.C. § 547(c)(2) (2012).
(1) Ordinary Course of Business or Financial Affairs of the Debtor and the Transferee
To determine whether the transfer at issue was made in the ordinary course of business or financial affairs of the debtor and the transferee the "controlling factor is whether the transactions between the debtor and the creditor, both before and during the ninety-day period, were consistent." In re Gateway Pac. Corp., 153 F.3d at 917 (citing Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991) ). Therefore, the issue to be decided is whether Hill & Hill has "demonstrate[d] 'some consistency with other business transactions between the debtor and the creditor.' " Cox v. Momar Inc. (In re Affiliated Foods Sw., Inc.), 750 F.3d 714, 719 (8th Cir. 2014) (quoting Lovett, 931 F.2d at 497 ).
Most cases examine whether the "preferential transfer involved an unusual payment method or resulted from atypical pressure to pay" but if "those factors are absent ... 'the analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day [preference] period reflected "some consistency" with that practice.' " Id. (quoting Lovett, 931 F.2d at 498 ).
The appropriate look-back period varies based on the facts in the particular case. "The purpose of a look-back period is to evaluate whether challenged transfers 'conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.' " Id. at 720 (quoting In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir. 1993) ).
(a) Unusual Payment Method or Atypical Pressure to Pay
The Partnership offers the affidavit of Tanya Hill in which she states, "There was no unusual collection activity related to the sale and payment for the wheat for which the [Transfer] was made by Turner Grain." (Mot. Ex. 1 ¶ 11). Jeff Hill's affidavit contains the identical statement. (Mot. Ex. 2 ¶ 11). The Trustee argues that the Transfer was atypical for several reasons: the Transfer paid four loads twice; the overage delivered was paid at the contract rate instead of the market rate; delivery sheets were sent to Hill & Hill twenty-three days prior to the Transfer being made; the Transfer replaced a previously voided check; and an employee of Turner Grain who processed the Transfer was subsequently employed by a company owned and controlled by Jeff Hill. (Resp. Br. at 6-7).
The Court does not believe there is a genuine issue of material fact as to whether there was any undue pressure asserted *65 by Hill & Hill to Turner Grain related to the Transfer, nor is there a genuine issue of material fact as to whether the payment method, i.e., check made payable to Hill & Hill and the Bank, is atypical.
However, other unresolved issues regarding unusual payment methods remain regarding the voided checks, the payment of the overage, delivery sheets sent to Hill & Hill prior to the Transfer, and the twenty-three day period between the date the Debtor may have generated and forwarded the delivery sheets and the date the Transfer was issued. Such issues would require the Court to weigh the evidence and make credibility findings, acts not appropriate at the summary judgment stage.
(b) The Timelines for Last Dates of Delivery and Check Dates
The Court reviewed the Summary Judgment Documents and summarized all information related to each transaction to determine, inter alia, the contract involved in the transaction, the last date of delivery for the contract, the date the check was issued, and other facts presented by the exhibits for each of the transactions. Although the Court's goal was to use the information to create a timeline supported by the record with facts not genuinely in dispute for analysis, the following discussion will illustrate why that goal was not met.
Tanya Hill included the Partnership's original timeline in her affidavit and its revised timeline in her supplemental affidavit. (Mot. Ex. 1 ¶ 6; Reply Br. Ex. 1 ¶ 9). The Partnership based its ordinary course of business analysis on a comparison of (1) the number of days between the last date of delivery for the grain confirmation related to the Transfer and the date the check for the Transfer was issued; and (2) the number of days between the last date of delivery for pre-preference period booking agreements and grain confirmations and the dates the Debtor issued checks for payment of that grain. (Mot. Ex. 1 ¶¶ 6, 10; Reply Br. Ex. 1 ¶ 9).
The Trustee makes a similar analysis in his Response. (Resp. Ex. 9). Both parties raise issues about the other's analysis, but the Partnership argues that even if the Trustee's arguments are all accepted as correct, summary judgment should still be granted in the Partnership's favor.
Below is a summary of the data contained in the Partnership's original timeline and the Trustee's timeline:
*66 Check Trustee Partnership Trustee Partnership Trustee Partnership Trans Crop Amount Last Delivery Last Delivery Check Date Check Date No. Days No. Days No.[11] Rice $246,811.60 02/16/2012 02/16/2012 03/01/2012 03/01/2012 14 14 Trans 1 Rice $127,307.74 03/19/2012 03/19/2012 04/04/2012 04/04/2012 16 16 Trans 2 Rice $157,769.84 03/30/2012 03/30/2012 04/18/2012 04/18/2012 19 19 Trans 3 Wheat $239,346.60 05/26/2012 ----- 06/05/2012 ----- 10 -- Trans 4** Wheat $153,575.61 05/28/2012 ----- 06/05/2012 ----- 8 Trans 5**[12] Wheat $ 69,956.66 06/19/2012 ----- 07/02/2012 ----- 13 Trans 6*[13] Corn $345,162.66 09/08/2012 09/08/2012 09/14/2012 09/14/2012 6 6 Trans 7 Corn $ 42,959.09 09/09/2012 09/09/2012 10/01/2012 10/01/2012[14] 21 21[15] Trans 8 Corn $ 4,214.30 09/09/2012 09/03/2012[16] 10/30/2012 10/30/2012 47 47[17] Trans 9 Corn $129,028.47 11/26/2012 11/26/2012 01/14/2013 01/14/2013 48 48[18] Trans 10 Rice $812,365.07 03/25/2013 ----- 04/12/2013 ----- 18 -- Trans 11[19] Rice $ 48,423.95 ----- 03/19/2013 ----- 04/12/2013 -- 24 Trans 11-1 Rice $401,341.85 ----- 03/20/2013 ----- 04/12/2013 -- 23 Trans 11-2 Rice $211,957.71 ----- 03/22/2013 ----- 04/12/2013 -- 21 Trans 11-3 Rice $150,641.56 ----- 03/25/2013 ----- 04/12/2013 -- 18 Trans 11-4 Corn $164,544.47 04/17/2013 04/17/2013 05/20/2013 05/20/2013 33 33 Trans 12 Wheat $276,578.72 07/10/2013 ----- 07/22/2013 ----- 12 -- Trans 13[20] Wheat $330,949.52 07/10/2013 07/10/2013 07/22/2013 07/22/2013[21] 12 12[22] Trans 14 Corn $385,630.62 10/09/2013 10/09/2013[23] 10/11/2013 10/10/2013 2 1[24] Trans 15 Soybeans $799,075.22 12/08/2013 12/08/2013[25] 12/12/2013 12/12/2103 4 4[26] Trans 16 Corn $300,000.00 02/14/2014 02/14/2014 03/06/2014 03/06/2014 20[27] 21 Trans 17 Rice $807,841.44 04/02/2014 04/02/2014[28] 05/01/2014 05/01/2014 28 28[29] Trans 18 Wheat $405,274.68 06/24/2014 07/08/2014[30] 07/31/2014 07/31/2014 37 23[31] Trans 19 Wheat $ 44,177.13 ---- 06/16/2013 ----- 07/29/2013 -- 43 Trans 20[32]
[Editor's Note: The preceding image contains the reference for footnote[11] ].
[Editor's Note: The preceding image contains the reference for footnote[12] ].
[Editor's Note: The preceding image contains the reference for footnote[13] ].
[Editor's Note: The preceding image contains the reference for footnote[14] ].
[Editor's Note: The preceding image contains the reference for footnote[15] ].
[Editor's Note: The preceding image contains the reference for footnote[16] ].
[Editor's Note: The preceding image contains the reference for footnote[17] ].
[Editor's Note: The preceding image contains the reference for footnote[18] ].
[Editor's Note: The preceding image contains the reference for footnote[19] ].
[Editor's Note: The preceding image *67 contains the reference for footnote[20] ].
[Editor's Note: The preceding image contains the reference for footnote[21] ].
[Editor's Note: The preceding image contains the reference for footnote[22] ].
[Editor's Note: The preceding image contains the reference for footnote[23] ].
[Editor's Note: The preceding image contains the reference for footnote[24] ].
[Editor's Note: The preceding image contains the reference for footnote[25] ].
[Editor's Note: The preceding image contains the reference for footnote[26] ].
[Editor's Note: The preceding image contains the reference for footnote[27] ].
[Editor's Note: The preceding image contains the reference for footnote[28] ].
[Editor's Note: The preceding image contains the reference for footnote[29] ].
[Editor's Note: The preceding image contains the reference for footnote[30] ].
[Editor's Note: The preceding image contains the reference for footnote[31] ].
[Editor's Note: The preceding image contains the reference for footnote[32] ].
(i) Booking Agreements and Grain Confirmations
When the Court was attempting to create a timeline supported by facts not genuinely in dispute, the primary fact sought from the information presented was the booking agreement or grain confirmation related to the numerous loads shown as being delivered in the Summary Judgment Documents. When asked about the contracts between Hill & Hill and Turner Grain, Jeff Hill and Gale Hamrick both testified that a written contract would usually follow after an oral booking agreement. (Resp. Ex. 1 at 10; Resp. Ex. 4 at 11). Jeff Hill, Tanya Hill, and Gale Hamrick all testified in their depositions that the payment process would begin after the final load would be delivered completing a booking agreement or contract. (Resp. Ex.
*68 1 at 28-29; Resp. Ex. 3 at 11-13; Resp. Ex. 4 at 11-12).
The Partnership asserts that its timeline reflects the number of days after completion of delivery of grain under a booking agreement to the date Turner Grain issued checks in payment for the grain. (Mot. Ex. 1 ¶¶ 6, 10). The Court, however, has been unable to tie the loads reflected on the Partnership's original timeline to particular booking agreements or grain confirmations . In attempting to identify the booking agreement or contract the Court makes several observations.
First, except as to Transaction 11, the parties appear to be assuming the settlement sheets or delivery sheets associated with each check are all related to the same booking agreement or grain confirmation. Then with this assumption the parties use the last date reflected on the sheets associated with the checks as the "last delivery date" for the transaction. However, the supporting documentation and the deposition testimony do not support this methodology.
For example, Jeff Hill attached to his affidavit the following six booking agreements:
(1) Contract Number JC-1002, for 140,000 bushels of corn with shipment expected to begin "September 2014 - February 2015," signed by Gale Hamrick March 31, 2014. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 187) ).
(2) Contract Number JC-2000, for 60,000 bushels of soybeans with shipment expected to begin at "Buyers Call," signed by Gale Hamrick March 31, 2014. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 188) ).
(3) The third agreement appears to be a duplicate of the first agreement described above. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 1061) ).
(4) The fourth agreement appears to be a duplicate of the second agreement described above. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 1060) ).
(5) The fifth agreement appears to be a duplicate of the first agreement described above. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 1059) ).
(6) The sixth agreement appears to be a duplicate of the second agreement.
(Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 1062) ).
Mr. Hill references a seventh agreement related to the Transfer that was to be attached as Exhibit B to his affidavit, but the filing did not include the agreement. (Mot. Ex. 2). The agreement related to the Transfer was attached to Mr. Hill's deposition. (Resp. Ex. 1, at Ex. 30). The Transfer agreement, Contract Number JC-3000, was for 55,000 bushels of wheat with shipment expected to begin "June-July 2014" and was signed by Gale Hamrick March 31, 2014. (Resp. Ex. 1, at Ex. 30 (Bates No. Hill & Hill 183); Resp. Ex. 4 at 42-43).
The Court attempted to tie the above booking agreements or grain confirmations to the appropriate transactions but was unable to do so. There are no grain confirmations for rice but Transaction Nos. 1, 2, 3, 11-1, 11-2, 11-3, 11-4, and 18 all involve rice. The settlement sheets for Transaction No. 1 reference "MGRR" as the "contract" instead of a designation such as JC-1002, JC-2000, or JC-3000. (Resp. Ex. 9, at Ex. A). The settlement sheet for Transaction No. 2 references "600D" as the "contract." (Resp. Ex. 9, at Ex. B). The settlement sheets for Transaction Nos. 3, 11-1, 11-2, 11-3, and 11-4 reference "LGRR" as the "contract." (Resp. Ex. 9, at Exs. C, K). The settlement sheet for Transaction No. 18 has the contract information blank but the check's memo has "LGRR." (Resp. Ex. 9, at Ex. R). From the information provided, the Court is unable to determine if Transaction *69 Nos. 3, 11-1, 11-2, 11-3, 11-4, and 18 are all covered under one "LGRR" contract or actually involve three or more booking agreements or contracts.
There is only one grain confirmation for wheat, Contract Number JC-3000 for 55,000 bushels of wheat, and it has been identified as the grain confirmation related to the Transfer (Transaction No. 19). (Resp. Ex. 1 at 24-26; Resp. Ex. 1, at Ex. 30). Two Purchase Settlement Summaries associated with Transaction No. 19 refer to Contract No. A001110-01. (Resp. Ex. 9, at Ex. S (Bates Nos. Hill & Hill 1056-1057) ). Two other Purchase Settlement Summaries associated with Transaction No. 19 refer to Contract No. A000575-01. (Resp. Ex. 9, at Ex. S (Bates Nos. Hill & Hill 1127-1128) ). The Court is unable to locate the contracts referred to on the Purchase Settlement Summaries and unable to determine whether the Transfer is, in fact, associated with loads delivered only in connection to Contract JC-3000.
There is one grain confirmation for corn, Contract Number JC-1002, for 140,000 bushels of corn with shipment expected to begin "September 2014 - February 2015" signed by Gale Hamrick March 31, 2014. (Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 187) ). There are seven transactions for corn, Transaction Nos. 7, 8, 9, 10, 12, 15, and 17, but there are no transactions for corn after March 31, 2014. The settlement sheets for Transaction Nos. 7, 8, and 9 reference "Hill & Dozier" as the "contract." (Resp. Ex. 9, at Exs. G-I). The settlement sheets for Transaction Nos. 10 and 11 reference "YC" as the "contract." (Resp. Ex. 9, at Exs. J, L). The purchase settlement summary sheet for Transaction No. 15 references two contract numbers, Contract Nos. 0001163-01 and 000105-01. (Resp. Ex. 9, at Ex. O). The settlement sheet for Transaction No. 17 references "3/14/2014" as the "contract." (Resp. Ex. 9, at Ex. Q). Again, neither the documents presented in support of the Motion nor the documents presented by the Trustee provide the Court with sufficient information to determine whether the transactions involve one or more contracts.
Finally, Transaction No. 16 involves soybeans. The Grain Confirmation for soybeans, Contract Number JC-2000, for 60,000 bushels of soybeans, by process of elimination, would appear to relate to Transaction No. 16, the only transaction involving soybeans. However, Check No. 18095 related to Transaction 16 in the amount of $799,075.22 was issued December 12, 2013, more than three months before the contract date of March 31, 2014. (Resp. Ex. 9, at Ex. P; Mot. Ex. 2, at Ex. A (Bates No. Hill & Hill 188) ).
The Purchase Settlement Summary for Transaction No. 16 refers to three contracts, Contract Nos. A000732-01, A000733-01, and A000734-01, and references 64,170.44 bushels of soybeans. The Settlement Sheet has three different prices. Gale Hamrick testified at her deposition that Jason Coleman would have probably booked three different contracts for soybeans. When asked if "Turner Grain customarily settle[d] and [paid] three different contracts simultaneously," Ms. Hamrick responded, "[c]orrect." (Resp. Ex. 4 at 34-35.) The Court was unable to tie the three contract numbers to any of the loads reflected on the delivery sheets.
As stated at the outset of this subsection, the parties appear to be assuming the settlement sheets or delivery sheets associated with each check are all related to the same booking agreement or grain confirmation. Then with this assumption the parties use the last date reflected on the sheets associated with the checks as the "last delivery date" for the transaction.
The above discussion highlights two problems with this methodology. First, as *70 illustrated by Transaction No. 16 and the testimony of Ms. Hamrick, it appears that Turner Grain, at least on occasion, would issue a check in payment of loads associated with more than one contract. Indeed from the above discussion it appears there are transactions other than Transaction No. 16 involving more than one contract. Second, without being able to associate the loads being delivered to a particular booking agreement or contract, a determination cannot be made as to when the last load is delivered under a particular contract .
For the reasons discussed above, the Court finds that the Partnership's analysis based on the last date of delivery under a contract is fatally flawed. Without being able to associate the loads being delivered to a contract, it is impossible for the Court to determine whether a load is the "last load" completing a particular contract. If the answer is in the 1,870 pages of the Summary Judgment Documents, it was not uncovered by the Court.
(ii) Reliability of Last Date of Delivery Dates in Timelines.
In addition to the difficulties encountered in determining whether the transactions cover part of a contract, just one contract, or more than one contract, a genuine issue of material fact exists with respect to the source of the information used by the Partnership in its timelines.
It is clear that the delivery dates reflected on the delivery sheets associated with the Transfer, Transaction No. 19, prepared using the AGRIS software, are untrustworthy. In preparing her original timeline, Tanya Hill determined the last date of delivery for Transaction No. 19 by referring to the Turner Grain Delivery Sheets. Based on that information, she listed July 8, 2014, as the last date of delivery. The Trustee's timeline reflected June 24, 2014, as the last date of delivery. After the Trustee produced the actual delivery receipts for Transaction No. 19, Tanya Hill revised her timeline to also use June 24, 2014, as the last date of delivery.
The Court reviewed the details contained in the actual delivery sheets associated with the Transfer. (Resp. Ex. 9, at Ex. S). There are seven Turner Grain Delivery Sheets involving a total of sixty-four loads of wheat associated with the Transfer. (Resp. Ex. 9, at Ex. S). The Court matched delivery sheets to sixty of the loads. Every delivery date on the Turner Grain Delivery Sheets for which the Court found the corresponding delivery receipt was inaccurate, ranging from one to sixteen days off. Although the issue of the "last date of delivery" appears to be resolved for Transaction No. 19, at a minimum the inaccuracies found by the Court call into question the veracity of the last dates of delivery for Transaction Nos. 15 and 16, also prepared using the AGRIS software. An excellent example of the unreliability of the dates is the fact that Tanya Hill's original timeline has December 8, 2013, for the last delivery date for Transaction No. 16; however, in her revised timeline she used the date of October 26, 2013 - a seventy day difference. The errors in the supporting documentation relate directly to dates the Partnership used in its timelines, making the Partnership's analysis unreliable.
(c) Additional Issues Raised
The parties have raised other unresolved issues regarding the timelines: whether Transaction Nos. 4, 5, 6, and 13 involving checks written to Hill & Hill by Ivory Rice should be included in the analysis; whether Transaction No. 9 should be included in the analysis, with the Trustee arguing it should not because it was a payment of a missed load; whether Transaction Nos. 11 and 11-1, 11-2, 11-3, and 11-4 should be viewed as one contract or four; whether Transaction 10 should be included *71 in the analysis since the delay in payment was due to the request made by Hill & Hill to not be paid on the transaction until 2013; and whether voided checks should be considered in the analysis.
While the Partnership argues that revising the timeline to accept the Trustee's arguments would still support granting summary judgment, the Court finds that the determination of the issues stated above would necessarily require the Court to weigh the evidence, make credibility determinations or undertake further fact finding in order to create a timeline the Court deems appropriate for analysis. Those actions are not properly performed at the summary judgment stage.
Therefore, for the reasons stated above and viewing the facts in a light most favorable to the Trustee, the Partnership's Motion as to the issue of whether the Transfer was made in the ordinary course of business or financial affairs of the Debtor and the transferee is denied.
(2) Made According to Ordinary Business Terms
The Partnership argues that the Trustee cannot avoid the Transfer because the Transfer was made according to ordinary business terms. To determine whether the transfer at issue was made according to ordinary business terms, the creditor must introduce evidence of a "prevailing practice among similarly situated members of the industry facing the same or similar problems." U.S.A. Inns of Eureka Springs , 9 F.3d at 685. The Partnership concedes in its Reply Brief that the Trustee has created a disputed issue of fact regarding the industry norms under Section 547(c)(2)(B). Therefore, based on this concession, summary judgment will be denied on the issue of whether the Transfer was made according to ordinary business terms.
In conclusion, the Partnership's Motion is granted as to the initial requirement of the ordinary course of business defense that the transfer was in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Hill & Hill. 11 U.S.C. § 547(c)(2) (2012). The Motion is denied as to the specific elements required for Section 547(c)(2)(A) and (B).
C. Subsequent New Value - Section 547(c)(4)
Pursuant to Section 547(c)(4), the Trustee may not avoid a preferential transfer to a creditor to the extent that the creditor, after such transfer, gave new value to the debtor. 11 U.S.C. § 547(c)(4) (2012). "New Value" is defined by Section 547(a)(2) as including "money or money's worth in goods, services, or new credit ... but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2) (2012).
As stated by the Eighth Circuit, to prevail under Section 547(c)(4), the creditor must establish three things: (1) that it " 'received a transfer that is otherwise avoidable as a preference under § 547(b) ;' " (2) " 'after receiving the preferential transfer, the preferred creditor ... advance[d] "new value" to the debtor on an unsecured basis;' " and (3) " 'the debtor [did] not ... fully compensate[ ] the creditor for the "new value" as of the date that it filed its bankruptcy petition.' " Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs, Inc. (In re Kroh Bros. Dev. Co.), 930 F.2d 648, 652 (8th Cir. 1991) (quoting New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.), 880 F.2d 679, 680 (3d Cir. 1989) ).
The purpose of Section 547(c)(4) is "to encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy *72 altogether." In re Jones Truck Lines, Inc. , 130 F.3d at 326. " 'The clear intent of Congress is that new value advanced by creditors should be available to debtors in the conduct of their business.' " Bergquist v. Anderson-Greenwod Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1280 (8th Cir. 1988) (quoting Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 56 B.R. 339, 393 (Bankr. D. Minn. 1985), aff'd, 850 F.2d 1275 ). "[T]he relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate." In re Kroh Bros. Dev. Co. , 930 F.2d at 652.
The advances of new value must have been made prepetition. In re Bellanca Aircraft Corp. , 850 F.2d at 1284.
(1) 800.71 Bushels of Corn
Here, the undisputed facts reveal that, subsequent to the Transfer, Hill & Hill delivered 800.71 bushels of corn and 352 bushels of wheat, with a combined value of $6,570.68, to the Debtor, for which Hill & Hill was never paid. The corn and wheat represent "new value" within the statutory definition as they are money's worth in goods. Because it is undisputed this new value was given after the Transfer and the Debtor did not compensate Hill & Hill for the goods, the Court finds that summary judgment should be granted to Hill & Hill pursuant to Section 547(c)(4) in the amount of $6,570.68.
(2) Cancellation of Contracts
In its Motion, the Partnership asserts that the Debtor's unilateral cancellation of outstanding contracts at the time it closed relieved the Debtor of an obligation of at least $300,897.43 at market prices and that to the "extent that the Partnership gave subsequent new value, the Transfer is unavoidable under 11 U.S.C. § 547(c)(4)." (Mot. ¶ 10).
In support of this allegation, Hill & Hill attached the Affidavit of Tanya Hill in which she makes the same statement contained in the Partnership's Motion that the Debtor's "unilateral cancellation of outstanding contracts at the time it closed relieved [the Debtor] of an obligation of at least $300,897.43 at market prices." (Mot. Ex. 1 ¶ 14).
The Partnership does not discuss the subsequent new value defense in its Brief nor cite any cases in support of its theory.
The Trustee did address this affirmative defense in his Response. The Trustee first states he does not dispute that the Debtor canceled contracts with Hill & Hill subsequent to the Transfer but argues nothing in the record indicates the date on which the contracts were cancelled, whether prepetition or postpetition. (Resp. Br. at 17-18).
The Trustee also disputes the market value of the farm products, alleging the $300,897.43 amount it is not supported by the record. The Trustee then argues that the cancellation of the contracts did not replenish the estate, and thus did not provide new value to the Debtor. (Resp. Br. at 17-18).
The Partnership fails to address its subsequent new value defense in its Reply, and therefore, fails to rebut the argument raised by the Trustee that the cancellation of the contracts does not replenish the estate and does not meet the requirements for "new value" under Section 527(a)(2) and (c)(4).
As pointed out by the Trustee, the record contains insufficient facts to determine the date or dates the outstanding contracts were canceled, a fact material to the analysis. Even with the cancellation date or dates, as a result of the Partnership's failure to address the subsequent new value defense in its Brief and in its Reply, it has *73 failed to cite any cases in support of its legal theory.
For the foregoing reasons, the Partnership's motion for summary judgment as to the affirmative defense of subsequent new value raised on the basis that the Debtor's unilateral cancellation of outstanding contracts at the time it closed relieved the Debtor of an obligation of at least $300,897.43 at market prices is denied.
IV. CONCLUSION
For the reasons stated herein, the Motion is granted in part and denied in part as follows:
(1) Summary judgment is denied as to the affirmative defense of Section 547(c)(1) ;
(2) Summary judgment is granted as to the first element of the affirmative defenses of Section 547(c)(2), but denied as to the affirmative defenses of Section 547(c)(2)(A) and (c)(2)(B) overall;
(3) Summary judgment is granted as to the affirmative defense of Section 547(c)(4) as it relates to the 800.71 bushels of corn and 352 bushels of wheat, but denied under Section 547(c)(4) as it relates to the cancellation of contracts.
IT IS SO ORDERED.

Billy is Jeff's father and Tanya is Jeff's wife. (SUF ¶ 5).

In its Reply Brief, the Partnership refers to the title of this document as 2013 as an "oversight" suggesting to the Court that this was intended to be for the year 2014. Nothing in the record supports this contention.

This statement by Ms. Hill concluded with "specifically, the release of Bank's security interest in the wheat and was, in fact, substantially contemporaneous." (Mot. Ex. 1 ¶ 12). Not only does the Trustee dispute this latter portion of her statement, the statement is a conclusion of law more appropriately determined by the Court.

7 U.S.C. § 1631, et seq. (2012).

The "lien" referred to by the Trustee in his Response Brief is the lien on the wheat as the Partnership had not raised the issue of the lien on crop proceeds at this point in the proceeding.

Referring to the defense raised in the case of Velde v. Kirsch, 543 F.3d 469 (8th Cir. 2008).

This designation is based on the 1974 song "Tin Man" sung by the band America with the lyrics, "But Oz never did give nothing to the Tin Man that he didn't, didn't already have." America , Tin Man (Warner Bros. 1974).

"State law controls the creation and perfection of security interests." In re Stevens, 307 B.R. 124, 128 (Bankr. E.D. Ark. 2004) (citing Meeks v. Mercedes Benz Credit Corp. (In re Stinnett), 257 F.3d 843, 845 (8th Cir. 2001) ); see also Ark. Code Ann. § 4-9-302 (2001).

For example, the same or similar provision is found in the state statutes for all other states in the Eighth Circuit. See Iowa Code Ann. § 554.9320(1) (West 2001) (Iowa); Minn. Stat. Ann. § 336.9-320(a) (West 2001) (Minnesota); Mo. Ann. Stat. § 400.9-320(a) (West 2001) (Missouri); Neb. Rev. Stat. U.C.C. § 9-320(a) (2007) (Nebraska); N.D. Cent. Code Ann. § 41-09-40(1) (West 2001) (North Dakota); and S.D. Codified Laws § 57A-9-320(a) (2000) (South Dakota).

For a list of states with central filing systems that have been certified by the United States Department of Agriculture, visit https://gipsa.usda.gov/laws/cleartitle.aspx.

The Court will discuss the transfers using the transaction numbers assigned by the Court in this column.

The face amount of the check for Transaction Nos. 4 and 5 is $392,922.21, which is the sum of the amounts listed on the Trustee's timeline for the two transactions. (Resp. Ex. 9, at Exs. D, E).

Transaction Nos. 4, 5, and 6 are not included on the Partnership's timeline.

The date on the face of the check is October 11, 2012. (Resp. Ex. 9, at Ex. H). The Partnership changed the date to October 11, 2012, on its revised timeline. (Reply Br. Ex. 1).

The Partnership changed this number to 31 on the revised timeline. (Reply Br. Ex. 1).

The Partnership corrected the year in its revised timeline from 09/03/2013 to 09/03/2012. (Reply Br. Ex. 1).

The number of days appears incorrect; it should be either 51 or 57 depending on the correct "last date of delivery."

The number of days appears incorrect; it should be 49.

The Trustee's timeline has one entry for the four entries reflected on the Partnership's timeline for the 4/12/2013 checks (see Transaction Nos. 11-1, 11-2, 11-3, and 11-4). (Resp. Ex 9, at Ex. K; Mot. Ex. 1).

Transaction No. 13 is not included in the Partnership's timeline.

The Partnership changed this date to July 24, 2013 in its revised timeline. (Reply Br. Ex. 1).

The Partnership changed this number to 14 in its revised timeline. (Reply Br. Ex. 1).

As discussed below, the dates on the AGRIS settlement sheets are likely incorrect. Both the Partnership in its original timeline and the Trustee used the date of October 9, 2013, for the last delivery date; however, in its revised timeline the Partnership used the date of September 23, 2013. (Reply Br. Ex. 1).

The Partnership revised this number to 16 on the revised timeline. (Reply Br. Ex. 1).

As discussed below, the dates on the AGRIS settlement sheets are likely incorrect. Both the Partnership in its original timeline and the Trustee used the date of December 8, 2013, for the last delivery date; however, in its revised timeline the Partnership used the date of October 26, 2013. (Reply Br. Ex. 1).

The Partnership revised this number to 47 on the revised timeline. (Reply Br. Ex. 1).

It appears this number does not take into account that February 2014 had 29 days.

The Partnership changed this date to April 1, 2014, on its revised timeline. (Reply Br. Ex. 1).

The Partnership changed this date to 30 on its revised timeline. (Reply Br. Ex. 1).

The Partnership changed this date to June 24, 2014, on its revised timeline. (Reply Br. Ex. 1).

The Partnership changed this number to 37 on its revised timeline. (Reply Br. Ex. 1).

Transaction No. 20 was not included in the Trustee's timeline nor in the Partnership's original timeline.